UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

LIBERTY INSURANCE CORPORATION, LIBERTY MUTUAL FIRE INSURANCE COMPANY, LIBERTY MUTUAL PERSONAL INSURANCE COMPANY, LM GENERAL INSURANCE COMPANY, LM INSURANCE CORPORATION, LM PROPERTY AND CASUALTY INSURANCE COMPANY, THE LIBERTY SURPLUS INSURANCE CORPORATION, SAFECO INSURANCE COMPANY OF AMERICA, SAFECO INSURANCE COMPANY OF ILLINOIS, STATE AUTO INSURANCE COMPANY OF OHIO, STATE AUTO NATIONAL INSURANCE COMPANY, and STATE AUTO PROPERTY AND CASUALTY INSURANCE COMPANY,

C.A. No. 2:25-12517-cv

       Plaintiffs,

v.

ANESTHESIA SERVICES AFFILIATES, P.L.L.C., CENTRAL HOME HEALTH CARE, INC., CENTRAL HOME HEALTH CARE SERVICES, INC., MICHIGAN AMBULATORY SURGICAL CENTER, L.L.C. d/b/a SPECIALTY SURGICAL CENTER, SPINE SPECIALISTS OF MICHIGAN, P.C., and LOUIS RADDEN, D.O.,

       Defendants.

---

**MARSHALL DENNEHEY**
Jeffrey G. Rapattoni, Esq. (P81455)
15000 Midlantic Drive, Suite 200 · P.O. Box 5429
Mount Laurel, NJ 08057
Phone: (856) 414-6000   Fax: (856) 414-6077
jgrapattoni@mdwcg.com

Attorney for Plaintiffs

**Law Offices of Greig, Kennedy,**
**Seifert and Fitzgibbons**
STEVEN M. BRAUN (P79461)
MATTHEW J. CHAPIN (P77613)
Attorney for Plaintiffs
28411 Northwestern Hwy., Suite 640
Southfield, MI 48034
248-395-5957
Fax: 603-334-9174

---

## **COMPLAINT**

This Is To Certify That No Other Civil Action Arising Out Of The Same
Transaction Of Occurrence As Alleged In This Complaint Has
Heretofore Been Commenced In This Court

By: *    /s/ Steven M. Braun*
STEVEN M. BRAUN (P79461)

NOW COMES Plaintiffs, LIBERTY INSURANCE CORPORATION, LIBERTY MUTUAL FIRE INSURANCE COMPANY, LIBERTY MUTUAL PERSONAL INSURANCE COMPANY, LM GENERAL INSURANCE COMPANY, LM INSURANCE CORPORATION, LM PROPERTY AND CASUALTY INSURANCE COMPANY, SAFECO INSURANCE COMPANY OF AMERICA, SAFECO INSURANCE COMPANY OF ILLINOIS, THE LIBERTY SURPLUS INSURANCE CORPORATION, COMPANY OF OHIO, STATE AUTO NATIONAL INSURANCE COMPANY, and STATE AUTO PROPERTY

AND CASUALTY INSURANCE COMPANY, (herein after collectively referred to as "Plaintiffs"), through undersigned counsel, Steven Braun and Matthew Chapin from the LAW OFFICES OF GREIG, KENNEDY, SEIFERT AND FITZGIBBONS, hereby allege as follows:

## I.    **INTRODUCTION**

1.    This case involves a coordinated and concerted effort between a medical clinic, an ambulatory surgical facility, an anesthesia provider, a home healthcare provider, a psychologist, and their owner(s)/manager(s), who abused the Michigan No-Fault Act, Mich. Comp. Laws§ 500.3101*, et seq*., by engaging in a scheme to defraud Plaintiffs by submitting false and fraudulent medical records, bills, and invoices through the U.S. Mail seeking payment under the No-Fault Act for treatment and services that were not actually rendered, were medically unnecessary, were fraudulently billed, and were billed at excessive rates.

2.    Defendants Anesthesia Services Affiliates, P.L.L.C. ("ASA"); Central Home Health Care, Inc. ("CHHC"); Central Home Health Care Services, Inc. ("CHHCS"); Michigan Ambulatory Surgical Center, L.L.C. d/b/a Specialty Surgical Center ("MI Ambulatory"); Spine Specialists of Michigan, P.C. ("Spine Specialists"); and Louis Radden, D.O. ("Dr. Radden"), (collectively, the "Defendants") individually or together conspired to, and did in fact, defraud Plaintiffs by perpetuating an insurance fraud scheme in violation of Michigan law.

3.     The insurance fraud scheme perpetrated by the Defendants was designed to, and did in fact, result in payments from the Plaintiffs to and on behalf of the Defendants pursuant to Michigan's No-Fault Act.

4.     As detailed below, the success of this scheme relied on a large base of patients who were eligible to seek benefits under Michigan's No-Fault laws.

5.     At all relevant times, the Provider Defendants were used as vehicles to bill for an array of tests, treatment, and services that were (1) not rendered; (2) medically unnecessary and pursuant to a predetermined treatment protocol; (3) fraudulently billed; and/or (4) not lawfully rendered.

6.     Dr. Radden's position of control over Defendants ASA, MI Ambulatory, and Spine Specialists with direct referral networks to Defendants CHHC, and CHHCS allowed him to (a) direct patient care; (b) ensure the delivery of an excessive number of tests, treatment, and services by the Provider Defendants; and (c) drive the unlawful referral of patients to other providers that were under his ownership/control.

7.     The Defendants' scheme relied on the transmission to the Plaintiffs, through the U.S. Mail, of false medical documentation demanding No-Fault benefits under Michigan law.

8.     The Plaintiffs reasonably relied on the facial validity of the records and bills mailed by the Provider Defendants when making No-Fault benefit payments to the Provider Defendants.

9.     These No-Fault benefit claim submissions were false and fraudulent because the records and bills contained material misrepresentations.

10.     The Plaintiffs estimate that the Defendants intentionally submitted hundreds of bills on behalf of the Provider Defendants knowing that none of the bills were lawfully compensable under prevailing Michigan No-Fault insurance laws.

11.     All of the acts and omissions of the Defendants, described throughout this Complaint, were undertaken intentionally.

12.     By this Complaint, and as detailed in each count set forth below, Plaintiffs seek damages under causes of action for: (1) VIOLATION OF 18 U.S.C. § 1962(c); (2) VIOLATION OF 18 U.S.C. § 1962(d); (3) common law fraud; (4) material misrepresentation; and (5) unjust enrichment. Plaintiffs also seek declaratory relief that no previously-denied and pending insurance claims submitted to it by the Defendants are compensable.

## II.    <u>THE PARTIES</u>

### A.    <u>Plaintiffs</u>

13.     Plaintiff Liberty Insurance Corporation is an insurance company with its principal place of business in Boston, Massachusetts, and duly organized under

the laws of Illinois that is licensed in Michigan to engage in the business of insurance.

14.   Plaintiff Liberty Mutual Fire Insurance Company is an insurance company with its principal place of business in Boston, Massachusetts, and duly organized under the laws of Wisconsin that is licensed in Michigan to engage in the business of insurance.

15.   Plaintiff Liberty Mutual Personal Insurance Company is an insurance company with its principal place of business in Boston, Massachusetts, and duly organized under the laws of New Hampshire that is licensed in Michigan to engage in the business of insurance.

16.   Plaintiff LM General Insurance Company is an insurance company with its principal place of business in Boston, Massachusetts, and duly organized under the laws of Indiana that is licensed in Michigan to engage in the business of insurance.

17.   Plaintiff LM Insurance Corporation is an insurance company with its principal place of business in Boston, Massachusetts, and duly organized under the laws of Illinois that are licensed in Michigan to engage in the business of insurance.

18.   Plaintiff LM Property and Casualty Insurance Company is an insurance company with its principal place of business in Boston, Massachusetts, and duly

organized under the laws of Indiana that is licensed in Michigan to engage in the business of insurance.

19.    Plaintiff The Liberty Surplus Insurance Corporation is an insurance company with its principal place of business in Boston, Massachusetts, duly organized under the laws of New Hampshire that is licensed in Michigan to engage in the business of insurance.

20.    Plaintiff Safeco Insurance Company of America is an insurance company with its principal place of business in Seattle, Washington, and duly organized under the laws of Iowa that is licensed in Michigan to engage in the business of insurance.

21.    Safeco Insurance Company of Illinois is an insurance company with its principal place of business in Bellevue, Washington, and duly organized under the laws of Iowa that is licensed in Michigan to engage in the business of insurance.

22.    Plaintiff State Auto Insurance Company of Ohio is an insurance company with its principal place of business in Columbus, Ohio, and duly organized under the laws of Ohio that is licensed in Michigan to engage in the business of insurance.

23.    Plaintiff State Auto National Insurance Company is an insurance company with its principal place of business in Columbus, Ohio, and duly organized

under the laws of Maryland that is licensed in Michigan to engage in the business of insurance.

24.     Plaintiff State Auto Property and Casualty Insurance Company is an insurance company with its principal place of business in Columbus, Ohio, and duly organized under the laws of Arkansas that is licensed in Michigan to engage in the business of insurance.

25.     At all times relevant to the allegations contained in this Complaint, the Plaintiffs were authorized to conduct business in the State of Michigan.

## B.     Defendants

### Anesthesia Services Affiliates, P.L.L.C.

26.     Anesthesia Services Affiliates, P.L.L.C., is a professional limited liability corporation incorporated under the laws of the State of Michigan.

27.     ASA's member is Defendant Dr. Radden, who is a citizen of the State of Michigan.

28.     ASA's principal place of business is located in Oak Park, Michigan.

29.     ASA is owned and controlled by Defendant Dr. Radden, who is responsible for all actions of ASA described throughout this Complaint.

30.     Defendant ASA was coordinated and controlled by Defendant Dr. Radden to act in concert with the other owned and controlled provider Defendants for the specific intent to defraud Plaintiffs.

31.     ASA billed Plaintiffs for services not rendered, that were not medically necessary (to the extent they were rendered at all), and that were unlawful in relation to several of Plaintiffs' insureds, including patients identified in **Exhibit 1** **[Chart – Claim Numbers ASA]**.

**Central Home Health Care, Inc.**

32.     Central Home Health Care, Inc. is incorporated under the laws of the State of Michigan.

33.     CHHC in conjunction with CHHCS bills Plaintiffs for alleged at-home services/treatment rendered to Plaintiffs' claimants and insureds.

34.     CHHC's principal place of business is located in Southfield, Michigan.

35.     CHHC is controlled by Defendant Dr. Radden, who is responsible for all actions of CHHC described throughout this Complaint.

36.     Defendant CHHC was coordinated and controlled by Defendant Dr. Radden to act in concert with the other owned and controlled provider Defendants for the specific intent to defraud Plaintiffs.

37.     CHHC billed Plaintiffs for services not rendered, that were not medically necessary (to the extent they were rendered at all), and that were unlawful in relation to several of Plaintiffs' insureds, including patients identified in **Exhibit 2** **[Chart – Claim Numbers CHHC]**.

## Central Home Health Care Services, Inc.

38.     Central Home Health Care Services, Inc. is incorporated under the laws of the State of Michigan.

39.     CHHCS is a successor corporation, that in conjunction with CHHC, bills Plaintiffs for alleged at-home services/treatment rendered to Plaintiffs' claimants and insureds.

40.     CHHCS's principal place of business is located in Southfield, Michigan.

41.     CHHCS is controlled by Defendant Dr. Radden, who is responsible for all actions of CHHCS described throughout this Complaint.

42.     Defendant CHHCS, was coordinated and controlled by Defendant Dr. Radden to act in concert with the other owned and controlled provider Defendants for the specific intent to defraud Plaintiffs.

43.     CHHCS billed Plaintiffs for services not rendered, that were not medically necessary (to the extent they were rendered at all), and that were unlawful in relation to several of Plaintiffs' insureds, including patients identified in **Exhibit 2.**

## Michigan Ambulatory Surgical Center, L.L.C.

44.     Michigan Ambulatory Surgical Center, L.L.C., is a limited liability corporation incorporated under the laws of the State of Michigan.

45.     MI Ambulatory's member is Defendant Dr. Radden, who is a citizen of the State of Michigan.

46.     MI Ambulatory currently uses the registered fictitious name "Specialty Surgery Center" and has used other registered fictitious names, including "Michigan Regional Ambulatory Surgery Center, LLC," and "Synergy Ambulatory Surgery Center, LLC" that per the Michigan Department of Licensing and Regulatory Affairs are now expired.

47.     MI Ambulatory's member is Defendant Dr. Radden, who is a citizen of the State of Michigan.

48.     At all relevant times, MI Ambulatory was operated and conducted by Defendants ASA, Spine Specialists, and Dr. Radden to act in concert with the other owned and controlled provider Defendants for the specific intent to defraud Plaintiffs.

49.     MI Ambulatory billed Plaintiffs for services not rendered, that were not medically necessary (to the extent they were rendered at all), and that were unlawful in relation to several of Plaintiffs' insureds, including patients identified in **Exhibit 3 [Chart – Claim Numbers MI Ambulatory]**.

**Spine Specialists of Michigan P.C.**

50.     Spine Specialists of Michigan, Inc. is incorporated under the laws of the State of Michigan.

51.     Spine Specialists' offices are located in Oak Park and Bingham Farms, Michigan.

52.     At all relevant times, Spine Specialists was operated and conducted by Defendants ASA, MI Ambulatory and Dr. Radden to act in concert with the other owned and controlled provider Defendants for the specific intent to defraud Plaintiffs.

53.     Spine Specialists billed Plaintiffs for services not rendered, that were not medically necessary (to the extent they were rendered at all), and that were unlawful in relation to several of Plaintiffs' insureds, including patients identified in **Exhibit 4 [Chart – Claim Numbers Spine Specialists]**.

**Louis Radden, D.O.**

54.     Defendant Louis Radden, D.O., is a resident and citizen of the State of Michigan.

55.     At all times relevant to this Complaint, Defendant Dr. Radden operated and controlled Defendants Spine Specialists, Michigan Ambulatory, ASA, CHHC, and Northwest.

## III.   JURISDICTION & VENUE

56.     Plaintiffs repeat, reiterate, and incorporate each allegation contained in all sections and subparts as well as all Counts within the pleading as though set forth at length herein.

57.     Pursuant to 28 U.S.C. § 1331, this Court has jurisdiction over this action relating to the claims brought by Plaintiffs under 18 U.S.C. § 1961, *et seq*. because they arise under the laws of the United States.

58.     Pursuant to 28 U.S.C. § 1332, this Court has jurisdiction over this action because the amount in controversy, exclusive of interest and costs, exceeds $75,000.00 against each Defendant and because it is between citizens of different states, as detailed in the foregoing section.  **Exhibit 5 [Summary of Financials]**.

59.     Supplemental jurisdiction over Plaintiffs' state law claims is proper pursuant to 28 U.S.C. § 1367.

60.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) as the vast majority of the acts at issue in this Complaint were carried out within the Eastern District of Michigan.

## IV.     BACKGROUND AND DEFENDANTS' SCHEME TO DEFRAUD

61.     The scheme described by this Complaint was driven by Defendant Dr. Radden through his control over Defendants Spine Specialists, MI Ambulatory, and ASA to perform unlawful, unnecessary, and or experimentally inefficacious procedures after extended predetermined treatment protocols, which Defendant Spine Specialists' medical personnel then use as justification for in-home care from Defendants CHHC and CHHCS. To further offer the auspices for serious and legitimate injuries, Defendant Dr. Radden, through his direct referral agreement with

non-parties Northwest Neurology PC and Phase One Rehab LLC, provided alleged psychological conditions and post-operative DMEs to further bolster the overall scheme to boost billing across these entities for unlawful/fraudulent repetitive treatment in order to take advantage of the insurance benefits available under the Michigan No-Fault Act.

62.     The purpose of the scheme was to generate as many bills as possible, without regard for medical necessity or patient safety, which bills were sent to Plaintiffs using the U.S. Mail.

63.     Defendant Dr. Radden owns at least three (3) of the Defendant clinics, including Defendant ASA, MI Ambulatory, and Spine Specialists, thus creating a strong financial incentive to refer patients between the Defendant clinics to maximize the total amount of bills submitted to insurers like Plaintiffs.

64.     Patients, such as Plaintiffs' claimants and insureds, who claimed to be involved in motor-vehicles accidents, were often steered to the Defendant medical providers by person(s) and/or entities affiliated who engage in illegal solicitation and by layperson personal injury attorneys, all of whom have direct affiliations to Defendants.

65.     The benefit, specifically to the personal injury attorneys, was the increased value to the bodily injury claims, as well as the no-fault claims presented by Plaintiffs' claimants and insureds, by Defendants through their predetermined

treatment protocols that gave the perception of more serious injuries than they actually were (if the patients were injured at all),  with invasive and wholly unnecessary and/or experimental and/or unlawful procedures and treatment options to further bolster the perception of these injuries.

66.    This predetermined treatment protocol included medically unnecessary and excessive procedures and injections that were needlessly administered in surgical suites under general anesthesia, surgeries that lacked objective medical support, unnecessary diagnostic testing, unnecessary post-surgical home therapy and DMEs, and unnecessary psychological/neuropsychological testing and treatment, all of which were billed by Defendants ASA, CHHC, MI Ambulatory, and Spine Specialists.

67.    To generate these interfacility referrals and run up enormous billables to be submitted to Plaintiffs, Defendant Spine Specialist would allegedly see patients for what it consistently billed at  Level 4 complexity codes, which requires that the physician must have taken a comprehensive (initial encounter) or detailed (re-evaluation) history, performed a comprehensive (initial encounter) or detailed (re-evaluation) examination, and engaged in medical decision-making of moderate complexity.

68.    In the rare instances that Defendant Spine Specialist billed at a Level 3 complexity for return examinations, this level of exam is still a moderate level of

complexity follow-ups that require evaluating and managing a patient's condition, typically involving a medically appropriate history and examination with a low level of medical decision making, usually lasting between 20-29 minutes during the encounter.

69.     In contrast to these complexity requirements, the medical records indicated numerous blatant errors and copy-and-paste sections of the medical records in relation to vitals taken, subjective complaints, and objective examinations.

70.     Based on the alleged symptoms and findings of these exams and re-exams, Defendant Dr. Radden would diagnose all patients with a variety of spinal and extremity issues that led to direct and controlled referrals to the remaining Defendant entities and providers.

71.     First, the unnecessary injections and procedures were performed (if at all) at Defendant MI Ambulatory, based on directed referrals from Defendant Spine Specialists with no option provided for alternatives for the patients, which allowed Defendants to submit additional charges to Plaintiffs for facility fees and Defendant ASA to submit additional charges to Plaintiffs for anesthesia.

72.     In addition to a battery of unnecessary injections, Defendants routinely billed for improper and experimental treatments that had no proven benefit.

73. Specifically, Defendant Spine Specialists' medical personnel utilize Defendant MI Ambulatory's facilities to perform injections with human amniotic fluid that were not approved for therapeutic use on patients.

74. Additionally, Defendant Spine Specialists' medical personnel would utilize Defendant MI Ambulatory to also perform Platelet Plasma Injections (hereinafter "PRP") that despite their questionable use in spinal related injuries were repeatedly done, absent any consistency or showing of proper procedure and handling for the extraction.

75. To further add to the economic interest and intent of generating billables, following alleged surgical procedures at Defendant MI Ambulatory, patients were referred to Defendants CHHC and CHHCS, without any knowledge of the referral even taking place, for purported in-home healthcare treatment, which billed outrageous rates for nursing services and in-home physical therapy that often was not performed at all, and was billed regardless of the severity of patients' alleged injuries or ability to attend far less expensive in-office care (if such care was necessary at all).

76. In line with the lack of consideration for patient well-being based on the questionable treatment/services rendered by his facilities, Defendant Dr. Radden is well aware of the impropriety of the exact type of reckless and improper overtreatment of patients described herein.

77.    The Michigan Board of Osteopathic Medicine and Surgery (the "Board") has sanctioned Defendant Dr. Radden for performing epidural steroid injections and facet injections at the same time, providing identical treatment without differentiating anatomical causes, and injecting doses of steroids that far exceed the standard of care.

78.    According to the Board's retained expert, "[t]here is absolutely no indication to perform [epidural steroid and facet] injections at the same visit… Doing multiple injections in the same anatomical location at that same visit is excessive and not supported in any peer-reviewed literature."

79.    As a result, the Board levied charges of incompetence and negligence against Defendant Dr. Radden by Administrative Complaint, which was resolved through a settlement and Consent Order.

80.    The Board's allegations against Defendant Dr. Radden are largely similar and directly relevant to the improper treatment described herein.

81.    The Defendant providers' bills were motivated solely by financial gain and had nothing to do with medical necessity.

82.    It is confirmed by the numerous examples of inexplicable and excessive services detailed below, and also by the fact that Defendant Dr. Radden routinely

associated with clinics and providers that were unlawfully operated and controlled by laypersons[1].

83.     Defendants CHHC and CHHCS has also been the subject of at least three (3) disciplinary investigations since 2015, which addressed numerous deficiencies, including the following: (1) failure to adequately coordinate, implement, and follow treatment plans; (2) failure to ensure plans of care for each patient were safe; (3) failure by a registered nurse to adequately monitor and report patients' health statuses; (4) failure to adequately instruct home health aides; (5) failure by a registered nurse to adequately supervise in-home patient visits; and (6) failure to conduct assessments that accurately reflected patients' current health status, past medical history, and ascertain patients' immediate care needs.

84.     As a result of their relationship and shared control, the Defendants and their associates had significant financial motivation to bill Plaintiffs for as many services, testing, and procedures as possible, all at excessive rates and regardless of medical need and applicable standards of care.

---

[1] Many of the patients at issue herein were referred between the Defendants and a clinic named Vital Community Care, P.C. ("Vital"), whose layperson owner, Youssef Bakri, pleaded guilty on February 28, 2022 to federal felony charges related to a scheme involving kickback payments for unnecessary drug testing. See United States v. Youssef Bakri, 21-cr-20484-NGE-EAS, Docket No. 23 (E.D. Mich.). Some of Spine Specialists' doctors, including Radden and Gary Gilyard, M.D. ("Gilyard"), also treated patients at Vital and utilized the surgical suites at MASC for unnecessary surgeries. Radden also purportedly performed services for a layperson-owned entity called Mercyland Health Services, PLLC, which has been the subject of numerous insurer fraud and law enforcement investigations and litigation.

85.   The Defendants' bills and associated records were sent to Plaintiffs through the U.S. Mail, and Plaintiffs relied on the mailings sent by the defendants in adjusting and paying insurance claims.

## V.   UNLAWFUL AND FRAUDULENT CONDUCT BY DEFENDANTS AND THEIR AFFILIATES

### a.   UNLAWFUL PATIENT SOLICITATION AND STEERING

#### i.   Michigan's Anti-Solicitation Laws

86.   Plaintiffs repeat, reiterate, and incorporate each allegation contained in all sections and subparts as well as all Counts within the pleading as though set forth at length herein.

87.   The solicitation and exploitation of motor vehicle accident victims for profit or professional gain is strictly prohibited in the State of Michigan, as is the use of factors other than legitimate medical judgment to bill insurers like the Plaintiffs.

88.   Michigan law prohibits "[a]ny physician or surgeon engaged in the practice of medicine in this state" from "employ[ing] any solicitor, capper, or drummer for the purpose of procuring patients." MCL 750.429.

89.   Michigan law also prohibits conduct such as the identification and solicitation of potential patients by medical providers, the use of agents to solicit patients, and the receipt of fees obtained through such fraudulent methods, including

the mere participation in any schemes relating to such activity.  *See* MCL§ 750.410b, 750.429, 257.503, and 500.4503(h)- (i).

90.     It is also illegal in Michigan to contact any motor vehicle accident victim to offer a service within thirty (30) days of the accident, MCL 750.410b, and to use police reports to solicit any person identified in the report, MCL 257.503(1)(a).

91.     Only "lawfully render[ed] treatment" is compensable under Michigan's No-Fault Act.  MCL 500.3157(1).

92.     As set forth more fully below, the Defendants participated in and willingly benefited from schemes to solicit patients through conduct prohibited under Michigan law.

### ii.     **Improper and Unlawful Methods Used to Solicit Patients**

93.     Despite Michigan's prohibition on patient solicitation, the Defendants employed multiple unlawful and improper methods to obtain patients.

94.     Much of the illegal solicitation of patients was performed by or on behalf of the Defendants' personal injury attorney associates, who referred such solicited patients to the Defendants as part of a *quid pro quo* arrangement to generate bills for No-Fault payments and thereby increase the value of claims against the Plaintiffs.

95.     In exchange for referrals from personal injury attorneys, the Defendants ordered, referred, and billed for extensive medically unnecessary treatment that was designed only to maximize the charges submitted to the Plaintiffs, and thereby increase the value of claims made both by the providers and by the personal injury attorneys.

96.     The Defendants obtained patients through the illegal use of unapproved police reports, i.e., through their affiliations with other questionable providers, that were procured by their associates and used to contact patients and pressure them to begin treatment they did not need or otherwise would not have had.

97.     Patients of the Defendants have testified that they were solicited by law firms in the days following their auto accidents, and then ultimately directed to the Defendants, particularly from nurse case managers hired by these law firms, to control the treatment to provide the perception of serious injuries to bolster the patients' recovery, specifically in bodily injury claims in exchange to allowing these providers to run up ridiculous medical expenses to be billed to Plaintiffs, the unlawful/fraudulent quid pro quo that was tailored to further the overall preparation, plan, system in doing an act, and/or scheme committed by Defendants.

98.     The unlawful solicitation and unqualified referral of patients to the Defendants by laypersons was an improper non-medical factor that directly led to the unnecessary and fraudulent bills submitted to the Plaintiffs detailed herein.

99.     The referral of alleged accident victims to the Defendants bore no relation to the medical necessity of the patients at issue in this Complaint, who would not have sought treatment but for the unlawful solicitation and referrals.

100.    The Defendants enabled and participated in this system of solicitation and referrals to obtain patients on whom they could implement a predetermined treatment protocol as described herein in order to bill for excessive and medically unnecessary treatment designed to maximize the charges billed to the Plaintiffs under the No-Fault Act.

101.    Accordingly, the Defendants' treatment of the solicited patients constituted unlawful, unreasonable, and unnecessary services that are not payable under the No-Fault Act.

### b.  <u>BILLING FOR SERVICES NOT RENDERED</u>

102.    The Defendants regularly submitted bills to the Plaintiffs seeking payment for treatment and services that were never rendered to patients at issue herein.

103.    The Defendants' pervasive pattern of faxing and mailing demands for payment for services that were not rendered is indicative of their goal to submit as large as, and as many bills for payment, as possible regardless of whether the treatment was actually rendered and whether it was medically necessary.

104.   All of the bills submitted by the Defendants to the Plaintiffs through interstate wires and the U.S. Mail seeking payment for treatment that never occurred are fraudulent.

105.   Plaintiffs are not required to pay the Defendants for services that were never provided to patients in this Complaint, and are entitled to recover any payments tendered to the Defendants as a result of their fraudulent billing for services not rendered.

106.   As an example, on all of the injections involving both the "Fluid Flow" human amniotic fluid and PRP, Defendant MASC routinely bills for both the injection substance and Introduction/Injection of Anesthetic Agent (Nerve Block), Diagnostic or Therapeutic Procedures, specifically to attempt to circumvent the no payment stance of Medicare and insurance carriers for these substances.

107.   This coordinated effort of unbundling and circumvention of the no payment stance, accounted for billing of $1,256,250.00. **Exhibits 1 through 5**.

108.   Aside from these codes, Defendants Spine Specialists and MASC are also billing for duplicative charges involving robotic therapy, CPT code S2900.

109.   In particular as to this issue is the $30,000.00 per use of the machine that is being billed by Defendant Spine Specialists even though the machine is not owned/leased to the physician/office and no additional expense is incurred. **Exhibits 1 through 5**.

110.   Specifically, the charge in question is routinely utilized as a tracking code to determine which surgeries were performed with the assistance and is not reimbursable.

111.   On top of these clear attempts to unbundle and bill for services not rendered, Defendant Spine Specialists further routinely billed for code 97039 and unlisted modality code for physical therapy services.

112.   The primary concern with the usage of this code by Defendant Spine Specialists is that it is being used as a catch all for services that may or may not have been rendered that have specific CPT codes that should be used.

113.   Illustrative of the same, claimant A.T.'s (claim no. 056317964) medical records for the usage of this CPT outline that plan as "modalities such as laser therapy to promote healing/improve soft tissue flexibility and E-stim for pain management," but the records do not indicate what, if any, of these services were actually performed for the $5,800.00 charge for 25 minutes of treatment time.

114.   Comparing these records to that of claimant T.M. (claim no. 032151146), where Defendant Spine Specialists sets forth a shorter narrative specifically to laser therapy and only provided 15 minutes of treatment time.

115.   As both of these dates of service have the same charge, the usage of a single unit with no variance further violates the standard billing practices for physical therapy to be billed per unit (typically 15-minute intervals).

116.   More problematic though, is the usage of the code instead of the appropriate specific CPT code for the individual services rendered, i.e., 97032 for e-stim, and more importantly, 0552T for low-level laser therapy.

117.   Taking these issues in conjunction with one another, and as outlined below, the specific safety protocols that are mandated for usage of laser therapy, it is apparent that the intent of these unlawful billing practices, without identification of the services being rendered if any were provided at all, is to attempt to avoid review by Plaintiffs of ensuring proper safety protocols were followed.

118.   Even more egregious than these issues, and in line with the overall preparation, plan, system in doing an act, and/or scheme committed by Defendants, Defendant Spine Specialists and Dr. Radden would routinely double bill for his services between Defendant Spine Specialists, and non-party Accurate Care LLC, who apparently has a contract with Defendant Dr. Radden to perform services for their facility as well.

119.   For example, as to claimant C.W. (claim no. 055679870), for date of service August 23, 2024, Defendant Spine Specialists provided a bill and records for an alleged lumbar spinal fusion for a total charge of $215,000.00 for Defendant Dr. Radden.

120.   For this same date of service and surgery though, non-party Accurate Care LLC, also billed Plaintiffs $35,300.00 for alleged services performed by Defendant Dr. Radden.

121.   Even though the billing amount is significantly reduced for non-party Accurate Care LLC, the same CPT codes are utilized on both bills, i.e. CPT 22842 & 22853.

122.   It is wholly unlawful for a physician to attempt to double bill their time across two entities, or even split their fees specific to two wholly different entities.

123.   Similar in nature and equally egregious, Defendants Spine Specialist and MASC on multiple occasions, would both bill for CPT code S2900 "Robotic Surgical System" totaling $70,000.00 between the two entities.

124.   The issue with this billing is that only one entity would be able to bill for the usage of the machine, which should be the surgical center that owns/leases the machine, as there is no additional cost for use of robotic technology and is nothing more than a method of performing the procedure, not a separate service.

125.   It is widely accepted, including by Medicare and all private insurance companies, that not only should the surgeon not be billing the S2900 code, the surgery center likewise should be reimbursed under this code, as it again is inclusive of the surgical codes for the procedure being performed.

126.   In addition to the issues outlined above, Defendant Spine Specialists routinely added charges for intraoperative neuromonitoring ("IONM") procedures to bills submitted to Plaintiffs for spinal surgeries.

127.   IONM is generally only used to ensure that patients with significant comorbidities do not suffer additional injury during a surgery, and is not appropriate nor medically necessary for all procedures and patients.

128.   Defendants Spine Specialists and MASC used IONM providers including non-party United Medical Monitoring P.C. and Comprehensive Care Services Inc., for alleged IONM services.

129.   These companies billed for both the technical and professional components of the alleged IONM services.

130.   Despite these other providers billing for all components of alleged IONM procedures, Defendant Spine Specialists, routinely also billed for alleged professional services for the same IONM services already billed for by United Medical Monitoring P.C., Comprehensive Care Services Inc., and other neuromonitoring entities.

131.   For example, United Medical Monitoring P.C., billed Plaintiffs for continuous monitoring allegedly conducted by Allen Mandir M.D. during D.W's (claim no. 055398351) cervical spinal fusion on May 11, 2024, with a 26 modifier (signaling the professional fee).

132.   Despite the billing provided by United Medical Monitoring P.C., the proper billing entity for the treatment/services rendered, Defendant Spine Specialists submitted a bill that included CPT code 95861 for needle electromyography with the exact same code with a 26 modifier (signaling the professional fee) on the same date to the same patient.

133.   Moreover, operative reports often failed to describe the IONM services for which Defendant Spine Specialists billed and in comparison, to the records from United Medical Monitoring, P.C., there is no question that no such services were performed by Defendant Spine Specialists or Defendant Dr. Radden:

| Surgeons | Technologists | Monitoring Physicians | Monitoring Times | Supervision Times |
|---|---|---|---|---|
| Louis Radden, M.D. | Paula Jarrell, CNIM | Allen Mandir, MD, PhD | 09:49  to  13:23 CDT | 07:55  to  13:23 CDT |
| | | | Total Time: 3:34 | Total Time: 5:28 |

134.   This exact same issue was present in relation to the lumbar spinal fusion performed on claimant K.G. (claim no. 036090631) for date of service April 8, 2023, but to an even more audacious level as both Defendant Dr. Radden and his alleged co-surgeon, Yedathore Mohan, M.D., both billed for CPT code 95861 for needle electromyography with the exact same code with a 26 modifier (signaling the professional fee) on the same date to the same patient, despite Comprehensive Neuro Monitoring LLC, again properly billing for the services.

135.   Even if Defendant Dr. Radden actually performed or supervised IONM, which he did not, accepted practice and billing guidelines set forth that a surgeon

performing an operative procedure may not bill separately for intraoperative neuromonitoring since those services are already covered by Defendant Dr. Radden's surgical/operative work.

136.   Plaintiffs are not required to pay for IONM charges for services that were not actually performed and is entitled to recover any payments tendered to the Defendants as a result of their fraudulent billing.

137.   In relation to Defendants CHHC and CHHCS, it operated pursuant to a predetermined protocol, whereby it billed for the same alleged wound care, nursing, and physical therapy services to patients who allegedly underwent surgical procedures (including minor arthroscopies and manipulations under anesthesia).

138.   Defendants CHHC and CHHCS adhered to this standardized billing protocol even when the services were not actually performed.

139.   Defendants CHHC and CHHCS routinely billed more than $3,000 for alleged physical therapy services simply for generating a record of discharge on dates no therapy was performed.

140.   For example, records and bills submitted to Plaintiffs for claimant C.W. (claim no. 046977721) for date of service August 15, 2022, CHHCS billed $3,327.99 for facility PT simply to provide a boilerplate discharge summary with carry over copied-and-pasted portions of prior records to add the auspices of detailed service

being performed, despite the fact that the records for that date outline the patient was

discharged on the prior date of service for August 13, 2022:

> Pain at DC: 8/13/22: 2-3/10 Low back, LEs. Pain not interfering ADLs, walking and other functional tasks. Inter. Aching in nature. Less than Daily and not constantly

141.   Even when CHHC and CHHCS generated records purporting to

document services to C.W, those services were largely merely education about post-

surgical care and certainly did not constitute more than $3,300 of physical therapy

services per date.

142.   This same issue was present with multiple other patients where services

were billed past discharge dates for what can only be described as administrative

tasks, if any services were actually rendered, including claimant K.G. (claim no.

040282526), where again CHHC and CHHCS billed for dates of service two days

after the discharge of the patient was completed for additional $3,300 of physical

therapy services per date

143.   Plaintiffs are not required to pay CHHC and CHHCS for physical

therapy or nursing services that were not actually rendered and are entitled to

repayment and full damages caused by CHHC and CHHCS's claims for services

that were not performed.

c. **FRAUDULENT, UNNECESSARY, AND EXCESSIVE TREATMENT**

**The Defendants' predetermined treatment protocol based on fraudulent/unlawful generation of medical records.**

144.  The pattern of diagnoses and treatment implemented by the Defendants with respect to motor vehicle accident patients was characterized by (1) routinely recording substantially similar generalized complaints of non-specific pain in patients' neck, back, and various joints and extremities, (2) making highly similar diagnoses across patients beginning at the patient's initial evaluation and continuing throughout frequent re-evaluations ordered by the defendants, (3) ordering testing that was not actually used to guide patient treatment, (4) providing mirrored treatment plans that included immediate referrals for physical therapy and post-surgery/procedure DMEs and at-home physical therapy and nursing services, (5) never ending treatment plans to allow Defendants to generate enormous billings for each and every patient that started in the systematic treatment, even lacking benefit to the patients or being in their best interests in furtherance of the overall preparation, plan, system in doing an act, and/or scheme.

145.  The Defendants' predetermined treatment protocol began with alleged examinations, most of which required comprehensive examinations to be performed, which Defendant Spine Specialists' medical personnel employed stock language and phrases in initial and follow up patient evaluation reports that were used to give the

appearance of substantial injury and to justify follow up examinations and future treatment.

146.   This systemic problem appears throughout the different treatments that Defendant Spine Specialists would provide.

147.   Illustrative of these copied and pasted records is evident in records for V.M. (claim no. 05537935) as to her physical therapy progression through months and months of alleged therapy with the assessment over the course of three months:

**ASSESSMENT:**
Motivation level during today's treatment: Good

Patient benefited from and requires additional skilled therapy services to address the following functional limitations: Pain limiting function. Pt. should continue to improve with further skilled physical therapy. Decreased range of motion. Decreased strength.

**ASSESSMENT:**
Motivation level during today's treatment: Good

Patient benefited from and requires additional skilled therapy services to address the following functional limitations: Pain limiting function. Pt. should continue to improve with further skilled physical therapy. Decreased strength. Decreased range of motion.

**ASSESSMENT:**
Motivation level during today's treatment: Good

Patient benefited from and requires additional skilled therapy services to address the following functional limitations: Pain limiting function. Pt. should continue to improve with further skilled physical therapy. Decreased strength. Decreased range of motion.

148.   The only variance shown in these records is rearranging the commentary of decreased strength and decreased range of motion for the latter two visits to the first.  Other than that small change, there is zero change from date to date.

149.   Additionally, the following two visits have no variance between the two dates across the entirety of the alleged exams for claimant B.D., Claim No. 042921406:

**Lumbar Spine Examination**
**Inspection:** Patient is normal-appearing and alert and oriented times three. Leg lengths are equal. Hip exam is normal.
**Palpation:** Paraspinal muscle spasm was noted upon palpation of the lumbar spine. Midline tenderness is noted. Paraspinal muscle tenderness is noted bilaterally.
**Range of Motion:** Decreased lumbar extension with facet pain. Decreased lumbar flexion with facet pain. Lateral bending decreased to the left and right with facet pain to the mid thigh.
**Strength:** Neurological exam is 5/5 in the bilateral lower extremities with hip flexors, quadriceps, tibialis anterior, EHL and gastroc/psoas complex.
**Sensation:** There are no sensory deficits in the L1 to S1 distribution.
**Reflexes:** Deep tendon reflexes are +2/4 for quadriceps and Achilles, no clonus. Vascular exam is +2/4 for dorsalis pedis and posterior tibialis.
**Special Tests:** Positive straight leg raise test, positive contralateral straight leg raise. Downgoing Babinski. Negative Patrick's test bilaterally, 0/5 Waddell signs are positive including superficial tenderness, regional pain, simulation, overreaction and distraction.
**Gait:** Gait is normal. There are no signs of decompensation, kyphosis, scoliosis or pelvic tilt.

**Cervical Spine Examination**
**Inspection:** Cervical spine is in alignment.
**Palpation:** Midline tenderness is noted. Paraspinal muscle tenderness is noted. Trapezial muscle tenderness is noted.
**Range of Motion:** Cervical spine range of motion, chin to chest is one to two fingerbreadths. Patient has normal rotation and lateral bending of the cervical spine.
**Strength:** Neurologic exam is 5/5 in the bilateral upper extremities with deltoid, biceps, triceps, wrist flexors, wrist extensors, finger flexors, finger extensors and intrinsics. Rotator cuff weakness in the right shoulder.
**Sensation:** There are no sensory deficits in the C5 to T6 distribution.
**Reflexes:** Deep tendon reflexes are +2/4 for biceps, triceps, brachioradialis with negative Hoffman's sign and negative clonus.
**Special Tests:** Positive Hawkins; positive impingement; positive Neer's test; positive palpation tenderness over the AC joint, trapezial and biceps tenderness.

**Lumbar Spine Examination**
**Inspection:** Patient is normal-appearing and alert and oriented times three. Leg lengths are equal. Hip exam is normal.

**Palpation:** Paraspinal muscle spasm was noted upon palpation of the lumbar spine. Midline tenderness is noted. Paraspinal muscle tenderness is noted bilaterally.

**Range of Motion:** Decreased lumbar extension with facet pain. Decreased lumbar flexion with facet pain. Lateral bending decreased to the left and right with facet pain to the mid thigh.

**Strength:** Neurological exam is 5/5 in the bilateral lower extremities with hip flexors, quadriceps, tibialis anterior, EHL and gastroc/psoas complex.

**Sensation:** There are no sensory deficits in the L1 to S1 distribution.

**Reflexes:** Deep tendon reflexes are +2/4 for quadriceps and Achilles, no clonus. Vascular exam is +2/4 for dorsalis pedis and posterior tibialis.

**Special Tests:** Positive straight leg raise test, positive contralateral straight leg raise. Downgoing Babinski. Negative Patrick's test bilaterally, 0/5 Waddell signs are positive including superficial tenderness, regional pain, simulation, *overreaction and distraction.*

**Gait:** Gait is normal. There are no signs of decompensation, kyphosis, scoliosis or pelvic tilt.

### Cervical Spine Examination

**Inspection:** Cervical spine is in alignment.

**Palpation:** Midline tenderness is noted. Paraspinal muscle tenderness is noted. Trapezial muscle tenderness is noted.

**Range of Motion:** Cervical spine range of motion, chin to chest is one to two fingerbreadths. Patient has normal rotation and lateral bending of the cervical spine.

**Strength:** Neurologic exam is 5/5 in the bilateral upper extremities with deltoid, biceps, triceps, wrist flexors, wrist extensors, finger flexors, finger extensors and intrinsics. Rotator cuff weakness in the right shoulder.

**Sensation:** There are no sensory deficits in the C5 to T6 distribution.

**Reflexes:** Deep tendon reflexes are +2/4 for biceps, triceps, brachioradialis with negative Hoffman's sign and negative clonus.

**Special Tests:** Positive Hawkins; positive impingement; positive Neer's test; positive palpation tenderness over the AC joint, trapezial and biceps tenderness.

150.   Again, both of these dates of service are billed at a Level 4 complexity codes, which requires that the physician must have taken a comprehensive (initial encounter) or detailed (re-evaluation) history, performed a comprehensive (initial encounter) or detailed (re-evaluation) examination, and engaged in medical decision-making of moderate complexity, but clearly the physician did not even examine the patient and spent no time at all authoring records instead opting for a direct word for word carry over, even though the two dates are four months apart from one another.

151.   The Defendants' intent and willingness to falsify records and to bill for services that were never rendered, services that were based on forged and fabricated prescriptions and records, and/or services that were rendered unlawfully demonstrate

their intent and willingness to also bill for treatment that was unreasonable and unnecessary.

152.   The Defendants' goal was to bill for as much treatment as possible, for as long as possible, regardless of whether such treatment was reasonably necessary to patients' care, recovery, rehabilitation, and/or whether such treatment arose out of an alleged motor vehicle accident, in order to generate bills to the Plaintiffs.

153.   The Defendants' purported treatment also violated standards of care in the medical community, as services were not indicated, redundant, excessive, and repeated without any benefit to patients.

154.   The full extent of the Defendants' misrepresentations regarding the (lack of) lawfulness and necessity of the treatment they billed was not known to the Plaintiffs until Plaintiffs undertook a fuller investigation that culminated in the filing of this action.

155.   Plaintiffs are not required to pay the Defendants for treatment that was medically unnecessary, and it is entitled to the return of money paid as a result of the Defendants' fraud.

156.   None of the above facts were known to the Plaintiffs until Plaintiffs undertook a detailed investigation that resulted in the commencement of this action and are/were evident within the four corners of the medical records and bills submitted to the Plaintiffs by the Defendants.

## **Unnecessary & Unlawful Fluid Flow Injections**

157. In addition to the aforementioned issues relating to alleged treatment rendered by Defendants ASA, MI Ambulatory, and Spine Specialists would jointly bill regarding services rendered involving Fluid Flow from BioLab Sciences, Inc.

158. The issue with usage of this substance and its multiple similar substances that may also have been used by Defendants MI Ambulatory and Spine Specialists to perform injections setting forth the Fluid Flow substance on records, is that these products were never approved for clinical usage and never approved for marketing.

159. A lengthy warning letter issued by the United States Food and Drug Administration ("FDA") set forth multiple violations of federal law regarding usage, marketing, and manufacture of these substances including the following:

- Failing to have an Investigational New Drug Application ("IND") in effect on any of the substances in violation of 42 USC 262(a);

- Failure to establish appropriate written procedures designed to prevent contamination of products purporting to be sterile in violation of 21 CFR 211.113(b);

- Failure to establish laboratory controls that include scientifically sound and appropriate specifications to assure that drug products conform to appropriate standards of identity, strength, quality, and purity in violation of 21 CFR 211.160(b);

- Failure to establish and follow written procedures for cleaning and maintenance of equipment used in the manufacture, processing, packing, or holding of a drug product in violation of 21 CFR 211.67(b);

- Failure to investigate any unexplained discrepancy or the failure of a batch or any of its components to meet any of its specifications, including contaminating microorganisms, such as *Bacillus* species non-anthracis, *Fictibacillus* species, *Bacillus Pumilius*, Gram Positive Cocci, fungi, and *Bacillus megaterium* in violation of 21 CFR 211.192; and

- Failure to establish and follow a written testing program designed to assess the stability characteristics of drug products and to use the results of such stability testing to determine appropriate storage conditions and expiration dates in violation of 21 CFR 211.166(a).

160.   On top of the issue of failing to provide adequate information regarding the storage and shelf life itself of the products, the FDA acknowledged that BioLab Sciences, Inc., had discontinued the manufacturing of Fluid Flow, which draws further questions as to its usage as BioLab Sciences, Inc., set forth a one-year expiration date (which is questionable on its face based on the violation) for usage of the product, but Defendants MI Ambulatory and Spine Specialists were utilizing this product in injections well after a year after the warning letter was issued.

161.   In this letter it also clearly sets forth that all amniotic fluid products did not have an IND in effect to lawfully market the product, nor was a Biologics License Application[2] ("BLA") ever approved for these products.

162.   Despite the clear unlawful nature of usage of the amniotic fluid product, Defendants ASA, MI Ambulatory, and Spine Specialists generated $413,500.00 in

---

[2] As set forth by the FDA, the BLA license is to ensure that the product is safe, pure, and potent, and must be in effect before clinical use in humans.

billables related to the treatment/services provided with this product including surgeon/physician charges, surgical center charges, and anesthesia.

## Unnecessary & Unlawful Laser Therapy

163.   As part of the Defendants' predetermined protocol based on the aforementioned fraudulent and fabricated medical records from Defendant Spine Specialists and in addition to the multiple unlawful/unnecessary services/treatment performed by the Defendants in both primary and support roles, patients from these facilities would also receive improperly performed laser therapy.

164.   As indicated in most records and hidden in some circumstances by the provider to attempt to circumvent the safety protocols, Defendant Spine Specialists would provide treatment utilizing a class IV laser that each facility states is FDA approved.

165.   In some instances, Defendant Spine Specialists purposely mis-coded and mis-charted the laser services as miscellaneous codes without referencing the class of laser being used in the laser treatments; when they were, in fact, Class IV (high-energy) laser treatments.

166.   In coding in this matter, Defendant Spine Specialists in documenting and then submitting charges indicating that a wholly different service (97039

Unlisted Modality[3]) was performed than what was actually completed (high energy laser), is a fraudulent insurance act.

167.   Not only did Defendant Spine Specialists fail to bill properly for the Class IV robotic laser, but it also failed to adhere to the requirements of the FDA approval for use of said device, as not a single date of service had a specific prescription for use of the laser as a treatment modality.

168.   In addition to these issues, Defendant Spine Specialists also failed to adhere to the safety protocols set forth for use of the Class IV Laser.

169.   The Occupational Safety and Health Administration ("OSHA") utilizes the very same classification system as the FDA and, in its Technical Manual, notes that safety goggles are required for anyone near the operation of a Class IV laser. **Exhibit 8 [OSHA Technical Manual]**.

170.   According to the Michigan Department of Licensing and Regulatory Affairs, "[t]he use of lasers by health professionals constitutes a medical or dental practice and falls within the definition of the practice of medicine. Since the use of lasers is considered the practice of medicine and the practice of medicine is a learned profession, corporations and limited liability companies using lasers for medical or

---

[3] In addition to the issues addressed in this section, this CPT code is representative of constant attendance physical therapy even though the laser therapy is being performed by a robotic system. Moreover, on multiple dates of service, Defendant Spine Specialists lists a number of other physical therapy modalities that have specific CPT codes that Defendant Spine Specialists would be obligated to use.

dental services may only incorporate or organize as professional service corporations

(PCs) or as professional service limited liability companies (PLLCs). **Exhibit 9**

**[LARA Position Statement]**

171.   According to the LARA position statement,

"A physician/dentist may delegate the use of laser equipment to a licensed or unlicensed individual if the delegated individual works under the physician/dentist's supervision. In this context, supervision, as defined by the Public Health Code, least all of the following:

- Acknowledgment by the physician/dentist that the delegated individual has the appropriate education, training or experience to properly use lasers.
- Continuous availability of direct communication in person. or by radio, telephone or other telecommunication, between the physician/dentist and the delegated individual.
- Regularly scheduled availability of the physician/dentist to consult, educate, and review the records and practice of the delegated individual in laser use.
- Development by the physician/dentist of written procedures and protocols to guide the delegated individual's laser use.

**Physician/dentists must adhere to these supervision requirements**. As the delegated individual works under the authority of a license, the licensed physician/dentist is ultimately responsible for the outcome of the tasks and duties performed by the delegated individual."

172.   As Defendant Spine Specialists do not have any physicians on staff and

simply allow physical therapists and physical therapy technicians to perform the

treatment without any precautions taken, they are likewise directly violating the

protocols and safety procedures relating to the usage of the device.

## **Unnecessary & Unlawful Platelet Rich Plasma ("PRP") Injections**

173.    Similar in nature to the unlawful usage of Fluid Flow, Defendants ASA, MI Ambulatory, and Spine Specialists would jointly bill treatment/services rendered for PRP injections that were wholly unnecessary/experimental in nature.

174.    In particular, Defendants ASA, MI Ambulatory, and Spine Specialists billed a cumulative amount of $1,094,800.00 specific to PRP injections that lack any efficacy according to multiple scientific studies.

175.    Specifically, the alleged science behind PRP injections is theoretical and the research/studies have shown inconsistent findings.

176.    To this end, PRP injections as a whole, even when properly done from the point of blood draw through injection are experimental in nature and only to be used after all other treatment options, absent surgery, has been attempted without success.

177.    Defendants though do not even follow the proper medical procedure for these injections, causing them to be even more questionable in nature.

178.    For instance, each and every PRP injection that has been submitted for payment to Plaintiffs shows a mixing of the PRP with an anesthetic, which is outside the accepted procedure for the same:

-Under fluoroscopic control, fluoroscopy then confirmed focus on the **left** eye Scotty Dog at **L2** . A 22 gauge spinal needle was advanced to the superior articulating process and its corresponding transverse process of the pedicle of the **L2** vertebral body, then 2cc of a mixture of **2 cc of platelet rich plasma** and 8cc of 0.25% Marcaine with epinephrine was administered. The needle was removed. Fluoroscopy confirmed in focused on the **left** eye Scotty Dog at **L3** . A 22 gauge

-Under fluoroscopic control, fluoroscopy then confirmed focus on the **right** eye Scotty Dog at **L4** . A 22 gauge spinal needle was advanced to the superior articulating process and its corresponding transverse process of the pedicle of the **L4** vertebral body, then 2cc of a mixture of **3 cc of platelet rich plasma** and 8cc of 0.25% Marcaine with epinephrine was administered. The needle was removed. Fluoroscopy confirmed in focused on the **right**, eye Scotty Dog at **L3** . A 22 gauge

179.   Aside from this straightforward issue, there is the limited understanding and explanation of how the PRP is extracted from the blood and the evidence of the concentration of the white blood cells in the PRP for the specific injection as each area of the body would require a different volume.

180.   Adding to this, when deposed as to the injections he did, Defendant Dr. Radden could offer no explanation of the process instead deferring to his nurses who performed both the blood draws and the alleged centrifuging of the blood.

181.   Not only does the staff of Defendant MI Ambulatory lack any training or certification in this process, the usage of mixing the PRP with anesthesia goes against all scientific standards of the injection process as a whole.

182.   Therefore, it is clear that the billing related to these injections was for unreasonable/unlawful treatment/service which were completely inefficacious.

**Unlawful Retention and Accuracy of Medical Records**

183.   The culmination of the wrongdoing by Plaintiff in line with the foregoing is its complete lack of retention and accuracy in its medical records in violation MCL 333.16213 and 750.492a.

184.   For example, claimant R.H. (claim number 036090631), Dr. Radden originally performed a multi-level lumbar decompression with installation of expandable cages where he notes the use of 6.5 mm x 45 mm pedicle screws.

185.   Dr. Radden then performs a second surgery for the claimant at another level and in the process of completing the procedure determined there is movement in the prior two cages that required a change in the pedicle screws.

186.   Regardless of if this was actually done or not, the issue remains that in the surgical records for the second surgery the same exact screw is noted, 6.5 mm x 45 mm with no variance for the different expandable cages used.

187.   This same issue is present in a number of other similar procedures which does not show a variance in screw size, despite clear medical standards that would necessitate the same.

188.   In this same vein, the medical personnel across the board fail to document vital parts of surgery, such as in the same two surgeries noting how much bone marrow was extracted to soak the allograft in and if it was necessary to take bone marrow from both sides of the hip area.

189.   Dr. Radden himself testified that it is always 10ccs taken, but this is never noted in the medical records, and he acknowledged that it is possible this was not taken from just one side of the body.

## **Deviations from Standard Medical Practice**

190.   In line with Defendants' overall scheme to defraud Plaintiffs and generate billables outside of the best interests of Plaintiffs claimants and insureds that are receiving the alleged treatment/services, Defendants, through their various medical personnel, continually deviated from standard medical practice to expedite patients for risky and unnecessary surgical procedures.

191.   Inconsistent with accepted medical standards, the physicians at Defendant Spine Specialist would routinely move to highly invasive, and as identified above with the use of Fluid Flow and PRP injections, risky, experimental treatment modalities with no progression for conservative treatment.

192.   Specifically, these physicians would forego the option of cortisone injections in conjunction with physical therapy and instead opt for dangerous and unnecessary "clean ups" in shoulder and knees.

193.   For example, as to claimant B.C. (claim no. AB949-615506), Dr. Gilyard, without even seeing the patient for an office visit a single time, moved forward with a rotator cuff repair and decompression, without even the chance of offering alternative options, including a cortisone injection.

194.   Not only was there not an office visit, but there is no evidence that Dr. Gilyard even reviewed the MRI findings, much less the actual films to determine the need for surgery as to the same.

**<u>Unlawful Overbilling and/or Unbundling and Fraudulent Billing for Services</u>**
**<u>Not Performed by Defendants</u>**

195.   In line with the predetermined treatment of patients and the overall control by Defendants in order to drive billings to Plaintiffs Liberty and Safeco, there are a number of tactics utilized in furtherance of Defendants preordained system and preparation, plan, system in doing an act, and/or scheme.

196.   Specifically, when it comes to the billing for the above referenced injections, and those injections that did not include Fluid Flow or PRP, Defendants MI Ambulatory and Spine Specialists overbilled/unbundled regarding the use of procedure codes 64490 to 64495.

197.   On one occasion that is illustrative of multiple instances throughout the claims attached was an injection for Fluid Flow that includes three levels of codes (64493, 64494, and 64495 with the Fluid Flow Q4206 CPT code); however, given its payment status indicator in the ASC OPPS Addendum AA, which is N1, this code is not separately reimbursable. Status N1 indicates that 64491 is a packaged service that is not separately compensable. As the facility expense is included in the reimbursement for the facility expense associated with the first level performed, separate reporting evidences an attempt to obtain duplicate payment, which is a form of unbundling that is not permissible under MCL 500.3157a(2).

198.   In line with this level of unlawful billing practices, and as outlined above, there are multiple occasions of duplicative billing both across Defendant entities and with non-party entities billing for the same physician and procedures.

199.   Another example that appeared in a number of matters related to alleged shoulder surgeries performed at Defendant MI Ambulatory.

200.   In these procedures, the physician, primarily non-party, Dr. Gary Gilyard, represented the procedure was a repair of a chronic (rather than acute) rotator cuff tear, and also billed for a claviculectomy, synovectomy, extensive debridement, and subacromial decompression.

201.   The issues with the billing were twofold: (1) A charge for synovectomy is only proper when a procedure is done to address an underlying diagnosis of a pathologic synovium and not when an action is incidental to a separate procedure and (2) A charge for extensive debridement is only proper when the procedure involves debriding several separate compartments or areas of the shoulder from that which is the subject of the primary procedure. A separate billing code exists for limited debridement of a single area.

202.   Despite the medical records not supporting the billing of the CPT codes though, both charges appeared on a number of occasions.

203.   These aforementioned examples are illustrative of the totality of the claims attached to this complaint.

## VI.    UNLAWFUL AND FRAUDULENT CONDUCT BY DEFENDANTS AND THEIR AFFILIATES

204.   Plaintiffs repeat, reiterate, and incorporate each allegation contained in all sections and subparts as well as all Counts within the pleading as though set forth at length herein.

205.   The aforementioned scheme and actions by Defendants injured Plaintiffs Liberty and Safeco through Defendants violation of law.

206.   Pursuant to exhibits 1 through 5, Plaintiffs Liberty's and Safeco's injury includes, but is not limited to, compensatory damages in excess of $75,000.00.

207.   The aforementioned exhibits 1 through 5, identify monies paid by Plaintiffs Liberty and Safeco to and for the benefit of Defendants by date, payor, patient claim number, check number, and amount.

208.   None of these payments have been reimbursed at this point.

209.   Moreover, every payment identified in exhibits 1 through 5 were checks sent by Plaintiffs Liberty and Safeco to the Defendants entities through the U.S. Mail.

210.   As such, Defendants knew that the U.S. Mail would be used as part of their scheme to defraud, as Defendants only faxed and mailed medical records and bills for the purpose of having Plaintiffs Liberty and Safeco rely on such documents and mail payment in response thereto.

211.   Plaintiffs Liberty and Safeco also seek damages, in an amount to be determined at trial, related to the cost of claims handling/adjustment for claims mailed and faxed by Defendants and their affiliated Defendant entities.

212.   Plaintiffs Liberty and Safeco investigated each of the Defendants both individually and in connection with the comprehensive scheme detailed herein and incurred investigative and claims handling expenses with respect to each Defendant.

## VII.   <u>CAUSES OF ACTION</u>

### <u>COUNT I — VIOLATION OF 18 U.S.C. § 1962(c) (DEFENDANTS ENTERPRISE COLLECTIVELY) AGAINST DEFENDANTS ASA, CHHC, MI AMBULATORY, SPINE SPECIALISTS, and DR. RADDEN</u>

213.   Plaintiffs repeat, reiterate, and incorporate each allegation contained in all sections and subparts as well as all Counts within the pleading as though set forth at length herein.

214.   Defendants collectively constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

215.   In connection with each of the claims identified in the within Complaint, Defendants ASA, CHHC, MI Ambulatory, Spine Specialists, and Dr. Radden intentionally caused to be prepared, faxed, and mailed false medical documentation, or knew that such false medical documentation would be faxed and mailed in the ordinary course of each facilities' business, or should have reasonably

foreseen that the mailing of such false medical documentation by each facility would occur, in furtherance of the Defendants' scheme to defraud.

216.   Defendants knew that two (2) or more faxes and mailings would be sent to demand and receive payment from Plaintiffs Liberty and Safeco on certain dates, including, but not limited to, those mailings identified in the chart attached.  (Exs. 1 through 5).

217.   As documented above, Defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Plaintiffs Liberty and Safeco for medical services that were purportedly performed by each entity, which they knew would be billed by the respective facility, in order to collect payment from Plaintiffs Liberty and Safeco under applicable provisions of the Michigan No-Fault Act.

218.   Defendants ASA, CHHC, MI Ambulatory, Spine Specialists, and Dr. Radden and were responsible for all actions taken by these facilities and their respective staff.

219.   Defendant Dr. Radden and the medical personnel from Defendant Spine Specialists were responsible for the excessive and wholly unfounded treatment and surgical bills from Defendants ASA, CHHC, MI Ambulatory, Northwest, and Spine Specialists, if treatment was rendered at all.

220.    Defendants submitted, or caused to be submitted, false and fraudulent medical records, bills, and invoices that created the appearance of injury and permitted each facility to continue providing unlawful and unfounded treatment, if provided at all.

221.    As a result of, and in reasonable reliance on, these misleading documents and representations, Plaintiffs Liberty and Safeco, by its agents and employees, issued payment drafts to Defendants that would not otherwise have been paid.

222.    The Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Plaintiffs Liberty and Safeco's injuries.

223.    By virtue of the Defendants' violation of 18 U.S.C. § 1962(c), Plaintiffs Liberty and Safeco are entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT II — VIOLATION OF 18 U.S.C. § 1962(d), DEFENDANTS ASA, CHHC, MI AMBULATORY, SPINE SPECIALISTS, and DR. RADDEN

224.    Plaintiffs repeat, reiterate, and incorporate each allegation contained in all sections and subparts as well as all Counts within the pleading as though set forth at length herein.

225.   Defendants ASA, CHHC, MI Ambulatory, Spine Specialists, and Dr. Radden  conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of each named facility that rendered/provided treatment/services.

226.   Defendants ASA, CHHC, MI Ambulatory, Spine Specialists, and Dr. Radden each agreed to further, facilitate, support, and operate Defendants enterprise.

227.   As such, Defendants ASA, CHHC, MI Ambulatory, Spine Specialists, and Dr. Radden conspired to violate 18 U.S.C. § 1962(c) through means of direct solicitation and referral of each patient to each entity alleging that it provided treatment and/or services.

228.   The purpose of the conspiracy was to obtain insurance payments from Plaintiffs Liberty and Safeco on behalf of each entity even though said entity was not eligible to collect such payments by virtue of its unlawful conduct.

229.   Defendants ASA, CHHC, MI Ambulatory, Spine Specialists, and Dr. Radden  were aware of this purpose and agreed to take steps to meet the enterprise's conspiracies' objectives, including the creation and submission of claims for No-Fault benefits to Plaintiffs Liberty and Safeco and medical records containing misrepresentations arising from the unlawful and unprovided alleged treatment/services.

230.   Plaintiffs Liberty and Safeco have been injured in its business and property by reason of this conspiratorial conduct in that Plaintiffs Liberty and Safeco have been induced to make insurance payments Defendants ASA, CHHC, MI Ambulatory, Spine Specialists, and Dr. Radden as a result of each entities' and persons' unlawful conduct as set forth above.

231.   By virtue of the Defendants' violation of 18 U.S.C. § 1962(d), Defendants ASA, CHHC, MI Ambulatory, Spine Specialists, and Dr. Radden  are jointly and severally liable to Plaintiffs Liberty and Safeco, entitling Plaintiffs Liberty and Safeco to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of each entity, and others acting in concert with them, together with the costs of this lawsuit, including reasonable attorney's fees.

## COUNT III — COMMON LAW FRAUD

232.   Plaintiffs repeat, reiterate, and incorporate each allegation contained in all sections and subparts as well as all Counts within the pleading as though set forth at length herein.

233.   Defendants intentionally and knowingly made or caused to be made false and fraudulent statement of material fact to Plaintiffs Liberty and Safeco by submitting, and causing to be submitted, bills and related documentation for services that were either not performed, or were unfounded.

234.   The false statements of material fact include, but are not limited to, those misrepresentation as identified in the foregoing paragraphs.

235.   Defendants knew that these misrepresentations were false and fraudulent at the time they were made and submitted to Plaintiffs Liberty and Safeco for consideration of payment of said allowable expenses under the Michigan No-Fault Act.

236.   Defendants made the above-described misrepresentations and engage in such conduct with the intent, and in order to, induce Plaintiffs Liberty and Safeco to rely on the misrepresentations.

237.   Plaintiffs Liberty and Safeco reasonable relied upon such material misrepresentations to its detriment in paying numerous non-meritorious bills for allowable expenses in the form of treatment and/or services under the Michigan No-Fault Act and incurred expenses related to the adjustment and processing of claims submitted by Defendants.

238.   As a direct and proximate result of Defendants fraudulent representations and acts, Plaintiffs Liberty and Safeco have been damaged in their respective business and property as previously described herein.

## COUNT IV — CIVIL CONSPIRACY

239.   Plaintiffs repeat, reiterate, and incorporate each allegation contained in all sections and subparts as well as all Counts within the pleading as though set forth at length herein.

240.   Defendants combined and concerted to accomplish the unlawful purpose of defrauding Plaintiffs Liberty and Safeco by submitting claims for payment pursuant to applicable provisions of the Michigan No-Fault Act to which they were not entitled because (1) Defendants did not actually render the treatment and/or services for which claims were submitted, (2) Defendants did not provide reasonable necessary treatment and/or services, (3) Defendant did not lawfully render treatment, and/or (4) Defendants engaged in fraudulent billing practices.

241.   Defendants worked together to achieve an unlawful purpose, i.e. defrauding Plaintiffs Liberty and Safeco, for personal gain.

242.   This purpose was known to all Defendants and intentionally pursued.

243.   Despite knowing that Defendants were not entitled to payment pursuant to applicable provisions of the Michigan No-Fault Act because they billed for treatment and/or services that were (1) not actually provided, (2) were not reasonably necessary, (3) were not lawfully rendered, and/or (3) were fraudulent billed, Defendants nonetheless submitted, caused to be submitted, or knew that claims

would be submitted (with accompanying false medical documentation) to Plaintiffs Liberty and Safeco seeking payment.

244.   In reasonable reliance on Defendants false medical documentation that were submitted to Plaintiffs Liberty and Safeco, which then paid certain of the claims submitted.

245.   Defendants directly benefited from the payments made to each entity.

246.   All Defendants actively and intentionally partook in a scheme to defraud Plaintiffs Liberty and Safeco and also encouraged and aided other Defendants in the commission of acts done for the benefit of all Defendants and to the unjustified detriment of Plaintiffs Liberty and Safeco.

247.   Accordingly, all of the defendants are equally liable for the fraud perpetrated on Plaintiffs Liberty and Safeco pursuant to their conspiracy.

## COUNT V — PAYMENT UNDER MISTAKE OF FACT AS TO UNLAWFUL TREATMENT AND REFERRALS

248.   Plaintiffs repeat, reiterate, and incorporate each allegation contained in all sections and subparts as well as all Counts within the pleading as though set forth at length herein.

249.   Plaintiffs Liberty and Safeco paid the amounts described herein under a misunderstanding, misapprehension, error, fault, or ignorance of material facts, namely, the preparation, plan, system in doing an act, and/or scheme to defraud Plaintiffs Liberty and Safeco by misrepresenting the fact, lawfulness, and necessity

of treatment and/or services purportedly provided and billed by Defendants ASA, CHHC, MI Ambulatory, Spine Specialists, and Dr. Radden .

250.   Specifically, Defendants accepted patients that were unlawfully solicited and then Defendants referred these alleged injured persons to clinics Defendants Jiab Suleiman, Ramakrishnan, Zamorano, and Samer Suleiman have ownership interest, another clear unlawful act under state and federal law.

251.   Plaintiffs Liberty and Safeco sustained damages by paying under a mistake of fact the claims submitted by Defendants, which misrepresented the fact, reasonableness, necessity, and lawfulness of the medical services allegedly rendered and whether the patient's injury arose out of a motor-vehicle accident.

252.   Plaintiffs Liberty and Safeco are entitled to restitution from each of Defendants ASA, CHHC, MI Ambulatory, Spine Specialists, and Dr. Radden individually and jointly, for all monies paid to and/or received by them from Liberty.

## COUNT VI — UNJUST ENRICHMENT AGAINST DEFENDANTS

253.   Plaintiffs repeat, reiterate, and incorporate each allegation contained in all sections and subparts as well as all Counts within the pleading as though set forth at length herein.

254.   Defendants submitted, caused to be submitted, or benefited from claims submitted to Plaintiffs Liberty and Safeco that caused Plaintiffs Liberty and Safeco

to pay money, in reasonable belief that it was legally obligated to make such payments based upon Defendants' fraudulent misrepresentations.

255.   Plaintiffs Liberty's and Safeco's payments constitute a benefit which Defendants aggressively sought and voluntarily accepted.

256.   Defendant wrongfully obtained or benefited from payments from Plaintiffs Liberty and Safeco through the fraudulent scheme detailed herein.

257.   Defendants have been unjustly enriched by receipt of or benefit from these wrongfully obtained payments from Plaintiffs Liberty and Safeco.

258.   Defendants' retention of these payments would violate fundamental principles of justice, equity, and good conscience.

## COUNT VII — DECLARATORY JUDGMENT UNDER 28 U.S.C. § 2201

259.   Plaintiffs repeat, reiterate, and incorporate each allegation contained in all sections and subparts as well as all Counts within the pleading as though set forth at length herein.

260.   Defendants routinely billed for unfounded and unlawful services with respect to the patients at issue in this Complaint.

261.   Defendants also billed for services not rendered.

262.   Defendants also billed for services pursuant to a fraudulent scheme whereby patients were illegally solicited and referred to them for the purpose of

generating claims to Plaintiffs Liberty and Safeco, and not for the purpose of providing reasonably necessary medical treatment, testing, or services.

263. Pursuant to the Michigan No-Fault Act, an insurer is liable to pay benefits only for reasonable and necessary expenses for lawfully rendered treatment arising out of a motor-vehicle accident Mich. Comp. Laws §§ 500.3105 and 500.3107.

264. The lack of reasonableness and necessity are defenses to an insurer's obligation to pay No-Fault benefits arising out of a motor vehicle accident. Mich. Comp. Laws § 500.3107.

265. Where a provider is unable to show that an expense has been incurred for a reasonably necessary product or service arising out of a motor vehicle accident, there can be no finding of a breach of the insurer's duty to pay, and thus no finding of liability with regard to that expense.

266. Defendants continue to submit claims under applicable provisions of the Michigan No-Fault Act for unnecessary and unlawfully rendered medical services to Plaintiffs Liberty and Safeco, and other claims remain pending with Plaintiffs Liberty and Safeco.

267. Accordingly, Plaintiffs Liberty and Safeco requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the

Defendants billed for unnecessary and unlawful treatment that is not compensable under applicable provisions of the Michigan No-Fault Act.

268.   Plaintiffs Liberty and Safeco also requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that Defendants were engaged in a fraudulent scheme whereby they billed for unnecessary and unlawful treatment and submitted unreasonable charges for the same to Plaintiffs Liberty and Safeco at all relevant times.

269.   As such, Defendants have no standing to submit, pursue, or receive benefits or any other payment from Plaintiffs Liberty and Safeco, and Plaintiffs Liberty and Safeco requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that Defendants cannot seek payment from Plaintiffs Liberty and Safeco for benefits under Michigan's No-Fault Act, Mich. Comp. Laws § 500.3101, et seq., any policy of insurance, any assignment of benefits, any lien of any nature, or any other claim for payment related to the fraudulent conduct detailed in the within Complaint.

270.   Plaintiffs Liberty and Safeco further requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that Defendants cannot balance bill or otherwise seek payment from any person insured under an insurance policy issued by Plaintiffs Liberty and Safeco policy or for whom Plaintiffs Liberty

and Safeco is the responsible payor related to the fraudulent conduct detailed in the within Complaint.

## VIII.  **DEMAND FOR RELIEF**

WHEREFORE, Plaintiffs Liberty and Safeco respectfully pray that judgment enter in their favor as follows:

### COUNT I — VIOLATION OF 18 U.S.C. § 1962(c) (DEFENDANTS ENTERPRISE COLLECTIVELY) AGAINST DEFENDANTS ASA, CHHC, MI AMBULATORY, SPINE SPECIALISTS, and DR. RADDEN

a.  AWARD Plaintiffs Liberty and Safeco its actual and consequential damages in an amount to be determined at trial;

b.  AWARD Plaintiffs Liberty and Safeco treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

c.  GRANT Plaintiffs Liberty and Safeco injunctive relief enjoining Defendants from engaging in the wrongful conduct alleged in the within Complaint; AND

d.  GRANT all other relief this Honorable Court deems just.

### COUNT II — VIOLATION OF 18 U.S.C. § 1962(d), ETC. (411 THERAPY ENTERPRISE) AGAINST DEFENDANTS ASA, CHHC, MI AMBULATORY, SPINE SPECIALISTS, and DR. RADDEN

a.  AWARD Plaintiffs Liberty and Safeco its actual and consequential damages in an amount to be determined at trial;

b.  AWARD Plaintiffs Liberty and Safeco treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

c.  GRANT Plaintiffs Liberty and Safeco injunctive relief enjoining Defendants from engaging in the wrongful conduct alleged in the within Complaint; AND

d.  GRANT all other relief this Honorable Court deems just.

**COUNT III — COMMON LAW FRAUD**

a.  AWARD Plaintiffs Liberty and Safeco its actual and consequential damages in an amount to be determined at trial;

b.  AWARD Plaintiffs Liberty and Safeco its costs, including, but not limited to, investigative costs incurred in the detection of Defendants' illegal conduct; AND

c.  GRANT all other relief this Honorable Court deems just.

**COUNT IV — CIVIL CONSPIRACY**

a.  AWARD Plaintiffs Liberty and Safeco its actual and consequential damages in an amount to be determined at trial;

b.  AWARD Plaintiffs Liberty and Safeco its costs, including, but not limited to, investigative costs incurred in the detection of Defendants' illegal conduct; AND

c.  GRANT all other relief this Honorable Court deems just.

## COUNT V — PAYMENT UNDER MISTAKE OF FACT AS TO UNLAWFUL TREATMENT AND REFERRALS

a. DECLARE that Plaintiffs Liberty and Safeco have no obligation to pay pending or previously denied insurance claims submitted by Defendants for any or all of the reasons set out in the within Complaint;

b. DECLARE that Defendants, jointly and severally, cannot seek payment from Plaintiffs Liberty and Safeco pursuant to the Michigan No-Fault Act, Mich. Comp. Laws § 500.3101, et seq., any policy of insurance, any assignment of benefits, any lien of any nature, or any other claim for payment related to the fraudulent conduct detailed in the within Complaint;

c. DECLARE that Defendants, jointly and severally, cannot balance bill or otherwise seek payment from any person insured under a policy of insurance from Plaintiffs Liberty and/or Safeco or for whom Plaintiffs Liberty and/or Safeco is the responsible payor related to the fraudulent conduct detailed in the within Complaint; AND

d. GRANT such other relief as this Honorable Court deems just and appropriate under Michigan law and the principles of equity.

## COUNT VI — UNJUST ENRICHMENT AGAINST DEFENDANTS

a. AWARD Plaintiffs Liberty and Safeco its actual and consequential damages in an amount determined at trial; AND

b. GRANT all other relief this Honorable Court deems just.

## <u>COUNT VII — DECLARATORY JUDGMENT UNDER 28 U.S.C. § 2201</u>

a. DECLARE that Plaintiffs Liberty and Safeco have no obligation to pay pending or previously denied insurance claims submitted by Defendants for any or all of the reasons set out in the within Complaint;

b. DECLARE that Defendants, jointly and severally, cannot seek payment from Plaintiffs Liberty and Safeco pursuant to the Michigan No-Fault Act, Mich. Comp. Laws § 500.3101, et seq., any policy of insurance, any assignment of benefits, any lien of any nature, or any other claim for payment related to the fraudulent conduct detailed in the within Complaint;

c. DECLARE that Defendants, jointly and severally, cannot balance bill or otherwise seek payment from any person insured under a policy of insurance from Plaintiffs Liberty and/or Safeco or for whom Plaintiffs Liberty and/or Safeco is the responsible payor related to the fraudulent conduct detailed in the within Complaint; AND

d. GRANT such other relief as this Honorable Court deems just and appropriate under Michigan law and the principles of equity.

## <u>CERTIFICATION</u>

I hereby certify that to my knowledge, the matter in controversy is not the subject of any other action pending in any Court proceeding.

I have no knowledge at this time of the names of any other party who should be joined in this action.

**MARSHALL DENNEHEY**

Dated:  August 12, 2025

  _/s/ Jeffrey G. Rapattoni_
JEFFREY G. RAPATTONI (P81455)
15000 Midlantic Drive, Suite 200 · P.O. Box 5429
Mount Laurel, NJ 08057
Phone: (856) 414-6000  Fax: (856) 414-6077
jgrapattoni@mdwcg.com
Attorney for Plaintiffs

**Respectfully Submitted,**
**LAW OFFICE OF JASON SEIFERT**

By:  /s/ *Steven M. Braun*
STEVEN BRAUN (P79461)
Attorney for Plaintiffs
28411 Northwestern Hwy., Suite 640
Southfield, MI 48034
248-223-0120